The term limits addressed in this opinion are set forth in Articles V, § 3(2) and XVIII, § 11 of the Colorado Constitution. These term limits were enacted through initiatives approved by the People of the State of Colorado in 1990 (Amendment No. 5) and 1994 (Amendment 17).
 QUESTIONS PRESENTED AND CONCLUSIONS
Question No. 1: If an elected official has served the maximum number of consecutive terms in an elected body as a representative of one district, may that elected official move to a different district and immediately run for election to the same body to represent the new district?
Answer No. 1: No. An elected official from a particular district who has served the maximum number of consecutive terms in an elected body is precluded from immediately running for election to that body from another district.
Question No. 2: If redistricting creates a new or reconfigured district, may a term limited elected official immediately run for election to the same body from a new or reconfigured district?
Answer No. 2: No. Redistricting does not increase the limitation on consecutive terms that may be served by an elected official in a particular elected body.
Question No. 3: If an elected official has served the maximum number of consecutive terms for an "at-large" seat in an elected body, may that official immediately run for election to a specific district seat in that body? Conversely, if a member has served the maximum number of consecutive terms as a representative from a particular district, may that member immediately run for an at-large seat to the same body?
Answer No. 3: Both questions are answered in the negative. An "at-large" member of an elected body who has served the maximum number of consecutive terms may not thereafter run for election for a specific district seat in the same body. Similarly, a member of an elected body who occupies a district seat and has served the maximum number of consecutive terms is precluded from running immediately thereafter for election to that body as a member "at-large."
 BACKGROUND
Article V, § 3(2), of the Colorado Constitution limits the number of terms a state senator or representative may hold in the Colorado General Assembly.
 In order to broaden the opportunities for public service and to ensure that the general assembly is representative of Colorado citizens, no senator shall serve more than two consecutive terms in the senate, and no representative shall serve more than four consecutive terms in the house of representatives. This limitation shall apply to terms of office beginning on or after January 1, 1991. Any person appointed or elected to fill a vacancy in the general assembly and who serves at least one-half of a term of office shall be considered to have served a term in that office for the purpose of this subsection (2).
This constitutional provision is referred to as the "State Term Limit Amendment" in the discussion that follows.
A second, similar portion of Colorado's constitution applies to officials elected to offices in political subdivisions of the state. Article XVIII, § 11, of the Colorado Constitution, referred to below as the "Local Term Limit Amendment," states in pertinent part:
 [N]o nonjudicial elected officials of any county, city and county, city, town, school district, service authority, or any other political subdivision of the State of Colorado . . . shall serve more than two consecutive terms in office . . . .[1]
The two preceding provisions are referred to collectively as the "Term Limit Amendments."
The issues addressed in this opinion are not answered by a simple reading of the Term Limit Amendments. Although a number of reported court decisions address various issues related to term limitations, we are unaware of any case in Colorado, or in any other jurisdiction, that addresses directly the questions raised in this opinion. They are matters of first impression in Colorado.
Finally, the Term Limit Amendments restrict only those who would seek election to an elected body in which they served during the immediately previous term. Nothing in this opinion addresses or restricts the ability of a term-limited elected official to seek office in a different elected body.
 DISCUSSION
A single analysis, developed below, provides the foundation to answer each of the questions posed by the Secretary of State. For that reason, analyses of the separate questions are not broken out individually in this discussion.
As always, the inquiry starts with the specific words and phrases chosen in the Term Limits Amendments. In this instance, resolution of the issues presented turns on the meaning of the phrases "in the senate," "in the house of representatives," and "in office," as used in these provisions. If these phrases refer only to a particular district (e.g., the District 7 representative) or seat (e.g., an "at-large" seat), then a member elected from one district or seat may run immediately for office from another district or a specific district. Conversely, if these phrases refer more broadly to the elected institutions involved, e.g., the senate, house of representatives, or city council involved, then a member who has served the maximum number of consecutive terms in the elected body involved is precluded from running immediately for another term, even from a different district or seat.
When the words and phrases used in a constitutional provision are plain and unambiguous, the legal inquiry is at an end. They are to be given their plain and unambiguous meaning. Kane v. Town ofEstes Park, 786 P.2d 412 (Colo. 1990). In this instance, the first sentence of the State Term Limit Amendment is very specific: no senator shall serve more than two consecutive terms "in the senate" and no representative shall serve more than four consecutive terms "in the house of representatives." These phrases plainly refer to the elected institutions as a whole, and not to an election from a specific district or seat.
In contrast, the use of the term "office" in the second and third sentences of the State Term Limit Amendment is ambiguous. While the references to "in the senate" and "in the house" plainly refer to the whole elected bodies, the reference to an "office" is much less specific. In some contexts, senators and representatives are associated with, and are identified by, their particular district.[2] Moreover, the demographics of individual districts can vary widely and these differences can be important considerations in federal Voting Rights Act cases and in constitutional law.Sanchez v. State of Colorado, et al., 97 F.3d 1303 (10th Cir. 1996). If "office" is intended to refer to a particular district held by the senator or representative, then, to be consistent, "in the senate" or "in the house of representatives" must also refer to individual districts.
The use of "office" in the Local Term Limit Amendment similarly is ambiguous. Unlike the State Term Limit Amendment, however, the Local Term Limit Amendment does not contain a specific reference to an institution as a whole.[3]
A number of considerations suggest that the word "office" in both Term Limit Amendments refers broadly to entire elected institutions and not to individual districts or seats from which officials are elected. First, with respect to the State Term Limit Amendment, the substance of the term limit prohibition is set forth in the first sentence and is stated in terms of "in the senate" and "in the house of representatives." The term "office" in the second sentence appears only to be a shorthand reference to the more specific phrases of the first sentence. As such, the more general term, "office," is given meaning by reference to the more specific phrases in the first sentence ("in the senate" and "in the house of representatives"). Burlington Northern Railroad Co.v. Stone Container Corp., 934 P.2d 902 (Colo. 1997) (specific terms prevail over general terms).
Second, ambiguous terms in the constitution should be construed in light of, and give effect to, the purposes of the provision involved. See Water Rights of Park County Sportsmen's Ranch, LLPv. Bargas, 986 P.2d 262 (Colo. 1999) (when addressing questions of statutory construction, courts must ascertain the intent of the legislation and adopt a construction that best effectuates the purposes of the legislative scheme). I conclude that interpreting the term "office" to refer broadly to the elected institution, rather than to a particular district or seat, is more consistent with the purposes of the Term Limit Amendments, as described below.
The purposes of the Term Limit Amendments can be determined by reference both to the Amendments themselves and to the ballot documents drafted at the time the initiatives were enacted.Carrara Place Ltd. v. Arapahoe County Bd. Of Equalization,761 P.2d 197 (Colo. 1988); Legislature of the State of California v.Eu, 54 Cal.3d 492, 816 P.2d 1309 (Calif. 1991) ("Indicia of the intent of the voters with respect to initiative measure includes analysis and arguments contained in the official ballot pamphlet."). In Colorado, the Legislative Council of the Colorado General Assembly publishes and disseminates pamphlets that analyze ballot proposals.[4]
The Term Limit Amendments state a two-fold purpose: "to broaden the opportunities for public service" and to "assure that elected officials of governments are responsive to the citizens of those governments." Colo. Const., Arts. V, § 3(2) and XVIII, § 11(1). These twin purposes are also expressed and described in more detail in the 1990 and1994 ballot proposal pamphlets.
In the 1990 ballot proposal pamphlet, the arguments supporting the adoption of term limits are stated as follows:
 Our founding fathers believed holding elected office was a public service to be performed only for a limited time. Today, however, we refer to some elected officials as "career" or "professional" politicians and many such officials view their positions are career or lifetime jobs. This careerism stems partly from the fact that incumbents seeking reelection nearly always win. Once in office for long periods of time, incumbents tend to lose touch with the interests of their constituents and focus more of their attention on issues over which they have gained power through the seniority system. The result is a system in which political participation is discouraged, office holders are unresponsive to constituents, and elected officials spend more time on election campaigns than they do on their duties as public officials. A return to a "citizen" government through the limitations of terms is the answer to this political congestion.
 Long periods of service by public office holders does provide for experience but does not necessarily provide citizens with better lawmakers. Limiting terms of office will allow more individuals, particularly those with established professions or occupations outside of public office, the opportunity to serve the public. Broadening public service will invigorate the political system by making room for new policy makers with new perspectives on addressing public policy issues. Realizing that their terms of office are limited, public office-holders will be more productive, devote more time to their duties as elected officials, and will be more bold in political decision-making without fearing the potential impact of such decision on future reelection efforts. 1990 Ballot Analysis, supra, at 21.
The 1994 Ballot Analysis restates many of these arguments. It declares:
 Voters in Colorado adopted the concept of term limits in 1990 as a method of keeping elected officials from viewing their positions as lifetime or career jobs. By forcing turnover, new people will be able to enter the political scene and bring fresh ideas into the legislative branch of the government and to local governments. 1994 Budget Analysis, supra, at 54.
The purposes of Colorado's Term Limit Amendments are similar to the purposes of term limit initiatives enacted in other states in the early and mid-1990s. See, e.g., Schweisinger v. Jones,68 Cal.App.4th 1320, 1324, 81 Cal.Rptr.2d 183 (Calif. 1998) ("The primary purpose of Proposition 140 is to limit the advantages of incumbency and eliminate `a class of career politicians,' instead of the citizen representatives envisioned by the Founding Fathers."); Ray v. Mortham, 742 So.2d 1276, 1285 (Fla. 1999) ("The voters have also expressed a belief that politicians who remain in office too long may become preoccupied with re-election and become beholden to special interests and bureaucrats.").
Construing the term "office" to refer to the institution rather than to a particular district or seat within that institution is consistent with the purposes of the Term Limit Amendments. One of the principal goals of the Term Limit Amendments is to prevent political "careerism." Interpreting "office" to refer to a particular district would defeat this purpose. It would permit an elected official who has served the maximum number of consecutive terms in one district or seat to run for an "at-large" seat rather than a district seat, or to run again because some portion of the district's boundary has been altered. Interpreting "office" to refer to an institution, on the other hand, prohibits elected officials from extending their political careers in such circumstances. The latter interpretation more clearly effectuates this principal goal of the Term Limit Amendments.
Moreover, the authority and responsibility of an "office" extend beyond the interests of a particular district. An elected official may vote on any matter that comes before the governing body, even though the official is elected from a particular district or seat. In many cases, issues will affect the entire electorate and not just those within the official's own district. In this sense, the boundaries of the district or the nature of the seat the elected official occupies are not significant.
This distinction between the "office," on the one hand, and the electorate from which the official is elected, on the other hand, was drawn in Olsen v. Merrill, 5 P.2d 226 (Utah 1931). Redistricting resulted in an elected official residing in a district different from the one in which he was originally elected. Plaintiff, seeking a court determination that the change in boundaries resulted in a vacancy in the "office," argued the incumbent should not be permitted to hold office when he lived outside the district that elected him. The court rejected the claim, observing that:
 [t]he duties of the plaintiffs as members of the board of education of Provo City are in no sense confined to the municipal wards from which they were elected Every act that a member of the board is required to perform is an act for the entire school system. The only purpose served by a division of the city into municipal wards, in so far as the school system is concerned, is that each ward shall elect one member of the board. So long as the board member resides within the boundaries of the city he has or should have a direct interest in maintaining an efficient school district within the city. Id., at p. 228.
Thus, changing or reconfiguring districts or seats will not necessarily result in a "freshness of ideas" on the host of office-wide issues. On the other hand, interpreting "office" to refer to an institution necessarily brings in entirely new office holders. This latter view is more consistent with the goal of "freshness of ideas" of the Term Limit Amendments.
Defining "office" to refer broadly to the elected institution is consistent with court interpretations of term limitation provisions in other contexts. Courts have construed term limit amendments liberally to effectuate their purposes. Schweisinger v.Jones, 68 Cal.App.4th 1320, 81 Cal.Rptr.2d 183 (Calif. 1998);League of Women Voters v. Secretary of State, 683 A.2d 769 (Maine 1996). For the reasons discussed above, interpreting "office" to refer to the institution will more likely bring the "freshness of ideas" and mitigate the concerns of the power of special interests than an interpretation that permits elected officials to run for the same institution from a different seat or district.
Moreover, when assessing the intent and purposes of voter initiatives, courts give effect to the likely understanding of the "average voter," and generally eschew subtle legal nuances. See,e.g., McLauglin v. State Board of Education, 75 Cal.App.4th 196,216, 89 Cal.Rptr.2d 295 (Calif. 1999) (term limit initiative construed to give effect to "what the `average voter' would understand to be the intent of the law upon which he or she was voting"). An interpretation which construes "office" to distinguish between, for example, an "office" of a member at-large and an "office" of a particular seat, is not readily apparent from the language of the Term Limit Amendments, and, therefore, not likely the understanding of the "average voter."
Courts have rejected interpretations that frustrate the apparent purposes of term limits. For example, in Schweisinger v. Jones,supra., 68 Cal.App.4th 1320, plaintiff argued that "term" should be construed to require a full term and not a partial term. The court noted that if it were to adopt that definition, an elected official could run repeatedly by resigning shortly before the end of the term and thereby frustrate the purposes of the limitation. In the present case, interpreting "office" so as to allow an elected official to hold office for additional terms in the same elected institution because, for example, some portion of the district or ward is redrawn, or because the official is now running for a district seat rather than a "at-large" seat, would be at odds with the general purpose of the Term Limit Amendment.
Finally, an interpretation of "office" to refer only to a particular district creates complexity and confusion in the application of the Term Limit Amendments. If an official can run in a new district, then there is no obvious reason why the official could not also run from the same district in which the boundary lines have been redrawn. Aside from the problem that a reconfigured district may not change in any dramatic way the demographics of the old district, a complex and, perhaps, unsolvable problem arises of determining how much of a change is required in order for there to be a "new" district.
 CONCLUSION
Based upon the analyses set forth above, I interpret the phrases "in the senate," "in the house of representatives," and "office," as used in the Term Limit Amendments, to refer generally to an elected institution, and not to a particular district or seat from which a member is elected. It follows that an elected official who has served a maximum number of consecutive terms cannot immediately run again to the same elected body, and avoid the effect of the Term Limit Amendments, by moving to a new or reconfigured district or seat.
Therefore, I answer each of the questions posed by the Secretary of State in the negative. Moving to a new district will not allow a term limited elected official to run immediately for election to the same body. Redistricting will not allow a term limited official to run immediately for election to the same body. Finally, a change in the at-large or specific district nature of the seat the elected official currently occupies will not allow a term limited elected official to run again immediately for election to the same body.
Issued this 10th day of July, 2000.
KEN SALAZAR Attorney General
MAURICE KNAIZER Assistant Deputy Attorney General
NEIL TILLQUIST Assistant Attorney General
[1] If the term is less than two years, then the member is limited to three terms. Colo. Const., Art. XVIII, § 11(1).
[2] The senate and house of representatives are divided into districts. Article V, §§ 45 and 46.
[3] The absence of a specific reference to individual institutions does not suggest that "office" is intended as a reference to a particular district or seat. There are many types of municipal institutions to which officials are elected. Listing these institutions in the Amendment would be cumbersome.
[4] The 1990 and 1994 analyses by the Legislative Council for the Colorado General Assembly are published pursuant to § 2-3-303, C.R.S. and are generally made available to the public as a guide to the statewide measures decided in the 1990 and 1994 general elections. Legislative Council of the Colorado General Assembly,_An Analysis of 1990 Ballot Proposals (1990) (Research Publication No. 350) ("1990 Ballot Analysis"); Legislative Council of the Colorado General Assembly, An Analysis of 1994 BallotProposals (1994) (Research Publication No. 392) ("1994 Ballot Analysis"). Portions of these analyses are attached to this opinion. The Colorado State Archives also maintains audiotapes of joint "Review and Comment" meetings of the Legislative Council and Legislative Legal Services Committee. These entities meet with proponents and opponents of an initiative to review and comment on initiatives. Unfortunately, no tape exists of the joint meeting for the 1990 initiative, and the 1994 tape is inaudible. The State Archives also maintains tapes of the meetings of the Colorado Title Setting Board concerning the 1994 initiative. Our review of these tapes reveals that no discussions at these Title Board Meetings were relevant to the issues discussed in this opinion.